## BRUMMETT v. KING

No. 34370. Nov. 18, 1952.

Rehearing Denied Jan. 6, 1953.

*251 P. 2d 1062.*

Tom Smith, Wewoka, and John R. Miller, Sapulpa, for plaintiff in error.

George H. Jennings, Sapulpa, for defendant in error.

PER CURIAM. Herein we will refer to the defendant in error, E. G. King, as the proponent, and to the plaintiff in error, G. M. Brummett, as the contestant, that being the manner they were designated below.

Jennie Smith, herein referred to as testatrix, departed this life at Sapulpa, in Creek county, Oklahoma, on or about the 2nd day of August 1948, survived

by the contestant, a son by a former marriage, sometimes referred to in the testimony as Will Brummett. At the time of her death she was of an advanced age, given by most of the witnesses as at least 80 years.

On August 9, 1948, E. G. King, the proponent, filed a petition in the county court of Creek county, wherein he prayed for the admission to probate of a will executed by the testatrix on March 27, 1945, at Sapulpa, Oklahoma. Under the terms of this will the testatrix devised all of her estate to the proponent and totally disinherited her son, the contestant. On August 27, 1948, G. M. Brummett, the contestant, filed his objections to the admission to probate of that will, and on October 1, 1948, filed an amended response wherein he alleged that on March 23, 1948, at Sapulpa, Oklahoma, the testatrix executed a subsequent will wherein she revoked the will of March 27, 1945. In this later will the testatrix devised all of her estate to her son, the contestant, and named him as sole executor. In this amended response the contestant prayed that the will of March 27, 1945, be denied probate, and that the court admit to probate the later will of March 23, 1948, as the last will and testament of said Jennie Smith, deceased.

In answer to this amended response, the proponent filed an answer to contest, alleging the testatrix to have been totally incompetent and without sufficient testamentary capacity on March 23, 1948, to execute a valid will, and that by reason thereof the subsequent will, executed on that date, was void and of no effect and insufficient to revoke the prior will. The proponent also alleged that the subsequent will was obtained by fraud, duress and undue influence.

Trial was joined on the above issues and the county court of Creek county found the issues in favor of the proponent. That court found that the will of March 27, 1945, was a good and valid will and was properly executed by the testatrix. The court further found that on March 23, 1948, when the testatrix executed the second will, she lacked testamentary capacity and was incapable of executing a valid will. The court thereby found that the will of March 27, 1945, was the last valid will and testament of the testatrix and was not revoked by the subsequent will and entered its order admitting the will of March 27, 1945, to probate and denying probate to the will of March 23, 1948.

Appeal was taken by the contestant to the superior court of Creek county, where the action was tried de novo on both questions of law and of fact. After hearing the evidence offered by both parties the superior court, on April 29, 1949, entered the judgment upon which an appeal is predicated to this court. In this judgment the superior court sustained the findings and judgment of the county court which allowed the earlier will of March 27, 1945, and denied probate of the later will. The court found that the testatrix was wholly incompetent and without testamentary capacity on the date the later will was executed and that the later will was thereby void and of no effect, either as a last will and testament of the testatrix or as a revocation of the earlier will. Pursuant thereto the superior court entered its order admitting the will of March 27, 1945, to probate as the last will and testament of Jennie Smith, deceased.

Contestant filed motion for new trial which was overruled and has appealed to this court alleging some 14 assignments of error. Only three contentions. however, are argued in contestant's brief, and all center around the proposition that the trial court erred in holding that the testatrix lacked testamentary capacity at the time she executed the second will of March 23, 1948.

No evidence was offered below tending to dispute proper execution of either will, and the question before this court for consideration is the sufficien-

cy of the evidence as to lack of testamentary capacity of the decedent at the time she executed the second will in favor of her son, G. M. Brummett.

The record is voluminous and some fourteen witnesses testified on behalf of the proponent and some seven witnesses testified on behalf of the contestant. The testimony offered by both parties centered around the question of the mental and testamentary capacity of the testatrix.

The testimony of the proponent is not disputed that in 1945 the testatrix was a competent and capable person, possessed of testamentary capacity. Shortly prior to the date of execution of the first will she was a widow and divorcee, and had successfully operated various businesses in and around Sapulpa. The proponent, E. G. King, was a former husband, whose marriage to the testatrix had been annulled. Notwithstanding the annulment, however, the proponent and the testatrix continued closely associated in business and in their personal lives. The contestant was an adult son of the testatrix by an earlier marriage and had been separated from his mother since early childhood. The normal closeness and relationship of mother and son did not exist between the contestant and the testatrix prior to the year 1948. On or about the 21st of February, 1945, the contestant caused to be filed in the county court of Creek county an application for appointment of guardian wherein he alleged that his mother was an incompetent person and asked that a guardian be appointed over her estate. In this application it was alleged that the testatrix was under the undue influence of the proponent and was being cheated out of her property and estate. Upon hearing such application the county court of Creek county found that the testatrix was a competent person and able to properly manage her estate.

Following termination of these guardianship proceedings, the testatrix caused a will to be prepared which she executed and in which she disinherited her son and left her entire estate to the proponent, E. G. King. This will, executed on March 27, 1945, at Sapulpa, Oklahoma, is the will which was ordered admitted to probate by both the county court and the superior court of Creek county.

The evidence discloses that the testatrix continued in good health until the fall or winter of 1946 when she suffered a stroke. That this stroke adversely affected the physical health of the testatrix is admitted by both parties. The contention of the proponent is that the stroke also adversely affected the mind of the testatrix, and to such extent that she was totally lacking in testamentary capacity at the time she executed the later will. The contestant denies that the stroke adversely affected the mind and mental capacity of the decedent, but claims that it left her power of speech impaired and resulted in some paralysis to her hands.

Witnesses for the proponent testified generally that the stroke affected the mind of the testatrix and that this condition grew progressively worse, and to the extent that by January, 1948, she had practically no mental understanding or capacity at all; that by January, 1948, her condition was so bad that the proponent, who had been taking care of the testatrix, caused her to be placed in the nursing home of Maud Grissom in Sapulpa. Six of the proponent's witnesses saw the testatrix at various times following the stroke and up to the date she was placed in the home of Maud Grissom. These witnesses testified to a close acquaintanceship with testatrix over a number of years and stated that when placed in the nursing home her mind was gone and that she lacked the mental capacity to understand or make even the simplest of conversations. None of these witnesses, however, saw the testatrix between the time she was placed in the nursing home on January 4, 1948, and the date she executed the second will on March 23, 1948. Dr. E. W. King, of Bristow, who treated the testatrix dur-

ing and following the stroke, testified that the mental condition of the testatrix grew progressively worse following the stroke to the extent that by January, 1948, she was unable to talk and had no intelligence at all. He did not see the testatrix following her admission to the Grissom home, but was of the opinion that her condition was permanent and that any improvement in her mental condition was improbable.

The above testimony was supported by the testimony of two witnesses who had occasion to observe the testatrix after her admission to the nursing home.

The contestant's witnesses generally did not testify concerning the mental condition of the testatrix prior to the date of her entry into the nursing home. The witnesses for the contestant included the witnesses to the second will and those parties who were present at the time of its execution. Judge Lucien B. Wright, in whose office the will was executed, testified that the testatrix was able to answer questions concerning the will and gave all the necessary information for its preparation to the scrivener. He testified that the testatrix came to his office with Maud Grissom and that his son, C. O. Wright, who roomed in the Grissom home, called in Judge John R. Miller to prepare the will. Judge Miller testified that the testatrix gave him the information contained in the will and stated to him that the will expressed her desires. He stated the testatrix appeared competent and answered his questions intelligently and clearly.

Maud Grissom, operator of the nursing home and a witness to the will, substantiated the testimony of Judge Miller and Judge Wright as to the circumstances surrounding the execution of the will. She further stated that the testatrix was competent and normal for her age at all times since entry into her home, including the day of arrival. She stated that on the day of arrival that testatrix and the proponent sat

down and had dinner together in her home and conversed and ate in a normal manner. R. H. Kirk testified that he was a friend and business associate of C. O. Miller and a frequent visitor at the Grissom home; that he had talked to testatrix on numerous occasions while visiting C. O. Wright, and that on all such occasions he had found her able to talk intelligently and with understanding. He was a witness to the second will, but was vague as to what occurred at the time the will was executed. Another witness, J. H. Catlett, also testified as to the ability of the testatrix to make conversation while at the Grissom home, but his observations were limited to occasional casual greetings with her. Dr. P. K. Lewis testified that he had treated the testatrix on three occasions while at the Grissom home and that she answered his questions concerning her condition in a normal and intelligent manner and that he considered her mentally normal for her age. The contestant testified that he had not been close to his mother, had not seen her often prior to her admission to the Grissom home, but had visited with her there on several occasions after she sent for him. In his opinion she was normal mentally and a competent person.

In contradiction to the above the proponent offered the testimony of Fred Patrick, an attorney and former mayor of Sapulpa. This witness testified that he was formerly acquainted with the testatrix and that on four occasions he went out to the Grissom home to deliver articles to her at the request of proponent. He testified that the testatrix did not appear to recognize him and while she could converse some that she did not appear to understand normal conversation. In his opinion she was incompetent to have made a will. The testimony of Albert Randell, a policeman in Sapulpa, was also offered, and was to the effect that on two occasions he was called to pick up an elderly lady identified as the testatrix who was reported wandering around.

He placed the time as the spring or early summer of 1948. He testified that he found the testatrix wandering around in warm weather dressed in a heavy coat and without apparent realization of her whereabouts or identity. He was unable to make coherent conversation with her, and she was apparently lost and wandering in the wrong direction from town.

The contestant points out that the only witnesses testifying for the proponent who actually saw the testatrix after her admission to the Grissom home were the above witnesses Fred Patrick and Albert Randell; that the other witnesses, while stating as to her incompetency and condition prior to and on the date she began her residence at the Grissom home, admitted they would not know her actual mental condition on March 23, 1948, almost three months later when the second will was executed.

The first proposition raised by the contestant in his brief is that there was no evidence that the testatrix lacked testamentary capacity on March 23, 1948, when the second will was executed. It is true that the proponent offered no direct evidence as to the condition of the testatrix on that specific date. We stated in case In re Mason's Estate, Mason v. Utterback, 185 Okla. 278, 91 P. 2d 657, as follows:

"The question of mental capacity to make a will is a question of fact, and is to be determined from the condition of the testator's mind at the time of the making of the will; * * *. Prior and subsequent acts have bearing only to the extent of helping to determine the mental status at the time of the execution of the will".

We cannot say that there is no evidence of incapacity on the date the will was executed. Two witnesses testified as to the lack of testatrix's mental capacity to understand her actions and conduct during the period immediately surrounding the date of execution of this will. While neither witness had opportunity to observe the testatrix on the specific date in question, their observations were of such close proximity thereto as to reflect her general condition during her residence at the Grissom home. Numerous witnesses testified as to the lack of mental capacity of the testatrix during the period extending from the winter of 1946 to the time of her admission to the nursing home, some seventy-eight days prior to execution of the will in question. The testimony of these witnesses would establish a long period of incapacity on the part of the testatrix, which period was continuous and unbroken by any lucid interval or improvement. Such continuous and unbroken period, coupled with the testimony of the two witnesses who saw the testatrix after her admission to the nursing home, is proper evidence to be considered in determining her condition on the date of the execution of the will.

In speaking of such evidence, we stated in Edwards v. Miller, 102 Okla. 189, 228 P. 1105:

"Where the question of insanity of a person executing a deed, contract, or will arises, it is permissible to receive such evidence as to the condition of that person's mind, both before and after the time of executing such deed, contract, or will as reasonably tends to show the mental condition of the person at the time in question. In determining such mental condition, great latitude is allowed in the admission of evidence of his conversation, acts, and declarations inconsistent with his sanity."

In the California case of In re Alexander's Estate, 111 Cal. App. 1, 295 P. 53, the California court stated:

"The proof of the sanity of the testator and of the facts upon which his state of mind depends are not necessarily confined to the exact time of the execution of the will. Evidence of the testator's mental status, together with his appearance, conduct, acts, habits and conversations, both before and after the execution of the will, are admissible so long as they have a reasonable tendency to indicate his men-

tal condition at the time of the execution of the will. * * * This is particularly true when the characteristics of the malady indicate a permanent and progressing mental disease. * * *"

See, also, Peace v. Peace, 149 Okla. 123, 299 P. 451, and In re Schwartz's Estate, 67 Cal. App. 2d 512, 155 P. 2d 76.

It, therefore, appears clear that the proponent's evidence as to the continuing progressive degeneration of the testatrix' mind is proper evidence to have been received and considered by the court in determining her mental condition on the date of the execution of the will.

Contestant next argues that the act of the testatrix in making a new will and devising her estate to her son and only child is a rational and normal act and is in itself evidence of capacity and sanity. Conceding that such is normally a correct statement, such act is merely evidence and must be considered in the light of all the other evidence. In the instant case, the relationship between the testatrix and the contestant had not been the normal relation of mother and son, and had admittedly been strained. On the other hand, the proponent and the testatrix had been closely associated in business and in their personal lives and it appears that the proponent and the testatrix had lived together for a number of years prior to the stroke, and that following the stroke and until her condition became so bad that he could no longer do so, the proponent continued to live with and take care of the testatrix. Under such conditions, we cannot say that the act of the testatrix in devising her estate to the son was, in itself, strong evidence of rationality or capacity. In re Smith's Estate, 197 Okla. 405, 172 P. 2d 328.

Contestant's last and probably most persuasive point is that the rulings of the trial courts were contrary to the great weight of the evidence. The evidence, taken as a whole, with all its implications, is sharply conflicting. While only two of the proponent's witnesses testified as to the condition of the testatrix on any specific dates after January 4, 1948, their testimony is directly conflicting with the testimony of the witnesses for the contestant. The testimony offered by the proponent concerning the condition of the testatrix on January 4, 1948, and before, is also sharply conflicting with the evidence of the contestant. The proponent's evidence was to the effect that testatrix' mental condition was impaired by the stroke in 1946 and that this condition grew progressively worse and was continuous. The evidence of the contestant is that testatrix was possessed of testamentary capacity at all times. Maud Grissom, a witness for the contestant, testified that testatrix was competent and normal on January 4, 1948, when she entered the Grissom home, testifying that she sat down, conversed and ate a late supper with the proponent, all in a normal and rational manner. Proponent's witnesses, however, testified that on that same date she was unable to converse or understand even a simple conversation and was unable to feed herself ice cream, or recognize friends of long standing.

Thus, the testimony and contention of the proponent discloses and would establish a long and continuous lack of mental capacity, without improvement or lucid intervals. Contestant's testimony is in direct conflict with such condition, and cannot be reconciled except under the theory of lucid intervals or improvement in testatrix' condition. No evidence of such improvement or lucid intervals was offered in evidence and such was not the contention of the contestant. Thus the trial court was forced to choose which testimony was the more convincing and satisfactory.

There is no rule by which it may be determined with precision where testamentary capacity ends and incapacity begins, but this question must be determined from all the facts and circumstances of each particular case. Slater v. Phipps, 193 Okla. 267, 143 P. 2d 133.

Both the county court and the superior court of Creek county had opportunity and occasion to observe the witnesses on the stand; their candor or lack thereof; their apparent bias or prejudice and their general demeanor. Both courts found the testimony offered by the proponent to be more convincing and found that the testatrix lacked testamentary capacity. Testamentary capacity or lack thereof is a question of fact. Bilby v. Stewart, 55 Okla. 767, 153 P. 1173; In re Worrell's Estate, Murtey v. Stroup, 167 Okla. 172, 29 P. 2d 94. The judgment of the trial court will not be reversed unless against the clear weight of the evidence. In re Smith's Estate, supra; Slater v. Phipps, supra; In re Worrell's Estate, supra; In re Delancy's Estate, Sutton v. Delancy, 160 Okla. 57, 15 P. 2d 815.

We have carefully reviewed all the evidence and cannot say that the judgment of the trial court is against the clear weight of the evidence.

The judgment is therefore affirmed.

This court acknowledges the services of Attorneys Charles R. Fellows, T. Austin Gavin, and William M. Taylor, who as Special Masters aided in the preparation of this opinion. These attorneys were recommended by the Oklahoma Bar Association, approved by the Judicial Council, and appointed by the court.

HALLEY, V. C. J., and WELCH, CORN, GIBSON, DAVISON, O'NEAL, and BINGAMAN, JJ., concur.