Dorothy Elaine **ALBRIGHT**, Executrix of the Estate of Peter Joseph Jeplawy, Deceased, Plaintiff in Error,

v.

Elaine **MILLER**, Marylin Rivera and Geraldine Potchern, Defendants in Error.

No. 42410.

Supreme Court of Oklahoma.

March 24, 1970.

John M. Lawrence, Tom J. Lee, Oklahoma City, for plaintiff in error.

Charles Hill Johns, James F. Howell, Toney M. Webber, Midwest City, for defendants in error.

IRWIN, Chief Justice.

This case involves a will contest. The testator, Peter Joseph Jeplawy, and his first wife were divorced in 1937, after three daughters were born to this marriage, Elaine Miller, Marylin Rivera and Geraldine Potchern (contestants and defendants in error). He remarried and his second wife died in 1960. He executed the will in question on May 3, 1966, entered the hospital on June 7, 1966 and died July 4, 1966.

In this will he left $10.00 to each of his three daughters and left the remainder of his estate to a friend, Dorothy E. Albright, (proponent). His estate primarily consisted of two residential homes in Oklahoma City. He occupied one and proponent rented the other.

The county court sustained the will. Contestants appealed to the district court alleging undue influence, fraud and lack of testamentary capacity. The district court sustained a demurrer on the issues of fraud and undue influence but reversed the county court upon the grounds that testator, on the day he executed his will, did not have sufficient mental capacity to make, execute and publish a will and testament, and on said date did not possess sufficient mental capacity to know the extent of his property and the natural objects of his bounty. From the order overruling proponent's motion for a new trial this appeal was perfected.

Proponent contends that the judgment of the trial court is against the clear weight of the evidence and is not supported by law.

The record reflects that testator was a printer and had been employed by a local firm for about 16 years; that testator consumed wine and beer consistently during the last 15 years of his life and his drinking increased in 1965; that about the middle of March 1966, testator stopped going to work and his job was terminated about the middle of April 1966; that during this time and thereafter his drinking increased and his intake of food was reduced to an extreme minimum; and that his mind would wander from one subject to another and his answers were unrelated to the questions.

The contestants submitted the testimony of their doctors. Dr. P, who is the husband of one of the contestants, testified he was aware of testator's drinking problem during the last 15 years and had examined him in December of 1965; that his diagnosis at that time was alcoholic cirrhosis and/or organic brain disease, hepatic encephalopathy or liver disease affecting the brain; that the disease was due to alcoholic ingestion of alcohol associated with inadequate ingestion of food and the liver could not properly perform its function; that at that time testator's disease had progressed to such an extent you couldn't effect a cure and irreversible brain damage had already been done; that he advised testator if he did not seek medical help he would not live more than six months; and that by May 3, 1966, testator did not have sufficient mental capacity to properly comprehend most anything.

Dr. J, who was disinterested in the matter and had experience with this type problem, was testator's attending physician when he entered the hospital where various tests were conducted. He testified that he diagnosed testator's condition as acute decompensation of the liver with manifestations of very severe alterations in mental processes usual to this disorder together with chemical poisoning of the kidneys as a result of the liver disorder; that he would only casually consider the possibility that the duration of the disease had been less than a year; that on May 3, 1966, testator did not have the mental capacity to know and understand the extent of his property and the natural objects of his bounty and testator was totally incompetent to know and understand such concepts; and by an understanding of the natural course of the disease he would have predicted testator had long periods of time when his judgment was grossly faulty for as long as five or six years at least.

On cross-examination of Dr. J, it was brought out that testator made the monthly payments on his real property; that he paid his automobile payments; that he sent a monthly check to Michigan to pay his mother's telephone bill and had given her a Mother's Day present; and remembered each of his daughters on their birthdays. Dr. J was asked if these would be the acts of a man who did not know the consequences of his actions. Dr. J responded, "It could be, yes, sir." Later

on Dr. J was asked if there would be any period of time during the year preceding testator's death in which testator could be considered competent or able to understand the consequences of his acts and Dr. J replied, "Your Honor, I am not trying to evade the question—sincerely— here again, we are talking about the consequences of his acts. Now, from the standpoint of being lucid, this man or a man— any person with this illness—may be lucid enough to identify an individual; maybe lucid enough to discharge a regular, ordinary responsibility and may appear to be competent to make decisions of judgment, but in my opinion in relationship to this man and his illness, he was unable to make decisions concerning judgment on a sound, relevant basis for months prior to the time I saw him."

The trial court asked Dr. J this question: "Within this year, would there have been any time that he would have a lucid period when he would have known the consequences of his acts?" Dr. J answered, "In my opinion, no, sir."

Dr. N, who was also disinterested in the matter, performed an autopsy on testator which supported the previous diagnosis. He testified that based on findings and experience, the testator had severe, irreversible grave organic disease of the brain at least 6 months prior to death; that on May 3, 1966, testator did not have enough understanding to know the extent of his property and the natural objects of his bounty; and that testator could conduct simple acts but not conduct very complicated transactions.

The evidence submitted by proponent relating to the execution of this will reflects substantially the following: that testator contacted the attorney who prepared the will and appeared at the appointed time; that they talked for an hour or more about testator's assets, relatives and various other pertinent subjects; and that when the will was executed testator was sober. Another attorney was a witness to this will and he described the execution there-

of. He testified that after the will was duly executed he and testator visited about 35 to 45 minutes; that they discussed each others dogs and the testator recalled an incident when this witness previously had some printing done by testator's former employer; and that testator was perfectly sober and knew what he was doing and the disposition he was making of his property.

Proponent also introduced evidence that testator had always paid his regular monthly bills without assistance; that he always remembered Mother's Day and the birthdays of his children; and that one of the contestants wanted him to convert an insurance policy to her benefit and testator told her he would if she would pay the premiums. Proponent also had a Dr. P testifying in her behalf.

Proponent's evidence disclosed that the primary beneficiary (proponent) under the will had prepared meals for testator and had purchased his groceries and did other things for the comfort of testator.

Proof of testamentary capacity of a testator is not necessarily confined to the exact time of the execution of the will, but the court may consider such evidence of the testator's mental status, together with his appearance, conduct, acts, habits and conversation, both before and after the execution of the will, as would tend to show his mental condition at the time of the execution of the will. Brummett v. King, 207 Okl. 607, 251 P.2d 1062. Where in a will contest, the testator was shown by a preponderance of the evidence to be a chronic alcoholic and from the evidence bearing upon the subject there was ground for a reasonable difference of opinion as to the soundness of his mind for testamentary purposes, the trial court's judgment of the will's invalidity on account of testamentary incapacity was not clearly against the weight of the evidence; and this Court will not reverse a judgment of the trial court in refusing to admit a will to probate unless the judgment is clearly against the weight of the evidence. Duck-

wall v. Lawson, 197 Okl. 472, 172 P.2d 415.

The trial court determined that testator did not have the testamentary capacity to make a will and rendered judgment denying admission of the will to probate. It is evident from the trial court's findings that it placed a strong reliance on contestants' medical testimony. The trial court found that the doctor who testified on behalf of the proponent of the will "apparently was not positive at all in his testimony * * * but there isn't any escaping the contestants' medical testimony. It's so conclusive. * * *."

Although the evidence may disclose that on the day testator executed his will he appeared perfectly sober, was able to carry on a conversation and had been discharging his ordinary responsibilities; there is medical evidence that testator's physical and mental condition was such that testator's judgment was grossly faulty; that he was unable to make decisions concerning judgment for several months prior to the time he executed his will; and that testator did not have the mental capacity to know and understand the extent of his property and objects of his bounty and was totally incompetent to know and understand such concepts several months prior to and on the day he made his will.

■ We have carefully examined the record and can only conclude that the trial court's judgment that testator, on the day he executed his will, did not have sufficient mental capacity to make, execute and publish a will and testament, and on said date did not possess sufficient mental capacity to know the extent of his property and the natural objects of his bounty, is not against the clear weight of the evidence.

Judgment affirmed.

DAVISON, WILLIAMS, JACKSON, HODGES, LAVENDER and McINERNEY, JJ., concur.

BERRY, V. C. J., concurs in results.